**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| FRED GATES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-1394 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| BOARD OF EDUCATION of the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Fred Gates brings this action against his employer Defendant Board of Education of the City of Chicago for age and race discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.* and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Currently before the Court is Defendant's motion for summary judgment [59]. For the reasons set forth below, Defendant's motion [59] is granted. The Court will enter final judgment and close the case. Finally, as a housekeeping matter, document [60] is improperly labeled as a motion, when it is in fact an exhibit to Defendant's Local Rule 56.1(a)(3) Statement of Material Facts. Therefore, document [60] should be terminated as a motion.

**I.      Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements of undisputed material facts and supporting exhibits: [59-2], [71], and [80]. The Court construes the facts in the light most favorable to the nonmoving party—here, Plaintiff. Before discussing those facts, the Court turns to the requirements of Local Rule 56.1.

## A.     Local Rules

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law.  Each party opposing a motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials."  L.R. 56.1(b)(1), (3).  "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).  Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id*., or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000).  To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted.  See *Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005).  Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded.  *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).  "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

Plaintiff's Response to Defendant's Statement of Facts does not comply with these requirements.  Many of Plaintiff's "concise responses" do not directly address Defendant's

statement of facts but rather amount to lengthy recitations of unrelated allegations, some more than one page long. See, *e.g.*, [71] at ¶ 8. In addition, many of Plaintiff's responses set forth improper arguments, misrepresent the record, and are so repetitive that any relevant facts or responses are obfuscated in a deluge of unrelated or irrelevant assertions. In fact, it appears that Plaintiff has more or less copied most, if not all, of his Statements of Additional Fact and pasted them into his responses to Defendant's fact statements with little or no editing to suit the actual substance of the fact statements.

Nevertheless, the Court will exercise its discretion in the direction of leniency and consider the portions of Plaintiff's responses that arguably meet the requirements of the local and federal rules. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (making clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow * * * that district courts cannot exercise their discretion in a more lenient direction"). In doing so, the Court disregards denials that do more than negate its opponent's fact statements— that is, it is improper for a party to smuggle in new facts into its response to a party's Rule 56.1 statement of fact. See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008); *Tolson v. City of Chicago*, 2016 WL 1043326, at *1 (N.D. Ill. Mar. 16, 2016).[1]

_____

[1] The Court further notes that Plaintiff has submitted his own declaration in support of his responses to Defendant's Local Rule 56.1 statement and his own statement of additional facts. See [71-5]. "It is the task of the Court, with or without a motion to strike, to review statements of material fact and to eliminate from consideration any arguments, conclusions, and assertions that are unsupported by the documented evidence on record yet offered in support of fact statements." *Sherden v. Cellular Advantage, Inc.*, 2009 WL 1607598, at *1 (N.D. Ill. June 9, 2009). Under 28 U.S.C. § 1746, an unsworn declaration which is dated and signed by the declarant "under penalty of perjury" and verified as "true and correct" may be used in lieu of a sworn affidavit to support or respond to a motion for summary judgment. See *DeBruyne v. Equitable Life Assur. Soc'y*, 920 F.2d 457, 471 (7th Cir. 1990).

Plaintiff's declaration does not mention 28 U.S.C. § 1746. Instead, it inexplicably references "Section 1-109 of the Code of Civil Procedure," which presumably refers to 735 ILCS 5/1-109—an Illinois statute that imposes criminal liability for false statements in verified or sworn documents "filed in any *court of this State.*" Still, Plaintiff's declaration indicates that it was made "under oath and under penalty of perjury" and that Plaintiff certified that the statements contained therein were "true and

## B. Facts

The following facts are undisputed unless otherwise noted. "When we cite as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *King v. Chapman*, 2013 WL 6709623, at *3 (N.D. Ill. Dec. 16, 2013).

Plaintiff, an African American man born in 1965 (currently 52), has been employed as a building engineer for Defendant since 2004. Plaintiff is a member of Operating Engineers Union 399 and Local 143, which are operating engineers' unions. [71] (Additional Facts) at ¶ 6. In 2010, Plaintiff (then 45 years old) was hired to work at William C. Goudy Technology Academy ("Goudy") by Principal Pamela Brandt ("Brandt"). While at Goudy, Plaintiff held the only engineer position available at the school. From his date of hire until December 2012, Plaintiff reported directly to Brandt, and Brandt evaluated Plaintiff's performance. In a performance review dated June 12, 2012, Brandt gave Plaintiff an overall rating of "Outstanding" and an overall evaluation percentage of 98%. See [59-2] at ¶ 2; [56-19] (6/12/2012 Educational Support Personnel Performance Evaluation Record). In December 2012, Rafael Rivera ("Rivera")

---

correct." See [71-5] at 1, 2. Accordingly, even though this declaration improperly references 735 ILCS 5/1-109 instead of 28 U.S.C. § 1746, it includes language suggesting that Plaintiff knew that he was required to tell the truth and that there would be legal consequences for not doing so and also that the information conveyed is based on Plaintiff's personal knowledge. *Trapaga v. Cent. States Joint Bd. Local 10*, 2007 WL 1017855, at *6 (N.D. Ill. Mar. 30, 2007) (concluding that certain declarations were sufficiently verified when they contained language suggests that the declarants knew that they were required to tell the truth and that there would be adverse legal consequences for not doing so, but striking other declarations that lacked such language and only indicated that they were sworn under Section 1-109); cf. *Johnke v. Espinal-Quiroz*, 2017 WL 3620745, at *3 (N.D. Ill. Aug. 23, 2017) (striking affidavit that was undated and only contained language corresponding to Section 1-109). Thus, the Court finds that this declaration substantially complies with 28 U.S.C. § 1746, which is all that is required. See *Sheikh v. Grant Reg'l Health Ctr.*, 769 F.3d 549, 551 (7th Cir. 2014) (noting that a statement "might pass muster as a declaration, which can be substituted for an affidavit and thus constitute part of the evidentiary record, provided it complies with the formalities required by 28 U.S.C. § 1746"). A review of the declaration, however, reveals that it is replete with hearsay, speculation, and statements made without proper foundation. The statements contained in the declaration that are inadmissible have not been relied upon in the Court's assessment of Plaintiff's claims.

became Plaintiff's supervisor.  See [59-2] at ¶ 3.  Rivera's title was Facilities Manager, and in that role he supervised engineering work at sixteen schools.  As a result, Rivera had little in-person contact with Plaintiff, seeing him approximately three times per month.  *Id*. at ¶ 4.

### 1.    The Missing iPads

In November 2012, 24 iPads disappeared from Goudy.  Before their disappearance, the iPads were in a room that required a master key to enter, and therefore everyone who had a master key—20 staff members including Plaintiff—was interviewed in the ensuing investigation.  In addition, Brandt asked Plaintiff to assist investigators with the search of the school because Plaintiff knew the school very well.  *Id*. at ¶ 34.

Plaintiff was interviewed sometime in late January or February 2013.  After his interview, he went to Brandt's office where he became emotional and started crying about the investigation because he felt that he was being "wrongly accused of stealing" the iPads.  [59-2] at ¶ 37; see also [1] at Count I ¶ 13, Count III ¶ 12, Count IV ¶ 12, Count V ¶ 12; [59-2] at ¶ 44. Through his verified responses to interrogatories, Plaintiff elaborated that, during this conversation, Brandt "accused [Plaintiff] of stealing and admitted to running a credit check on him.  She stated that she based her accusation on the fact that Plaintiff had a judgment against him and he had previously filed for bankruptcy."  See [59-2] at ¶ 54; see also [59-7] (Plaintiff's Answers to Defendant's Interrogatories) at 1.  Later, at his deposition, Plaintiff testified:

> A.    **And so I came to the Goudy School, back to the Goudy School that morning; and Miss Brandt came into the office and I went to and talked to her and asked her and said, Miss Brandt, why would you, why would you think that I've taken something from your school, I'm not a thief, and I said is it because I'm black; and she said, yes, and we ran your credit report and you had two judgments against you * * * and a – you filed a Chapter 13.**

> Q.    So you asked Miss Brandt if she accused you of stealing because you're black?

> A.    **Yes, sir.**

[59-5] (F. Gates Dep. I) at 64:12-24. Brandt denied knowledge of credit reports being pulled in the course of the investigation. [59-2] at ¶ 36. In any event, the parties agree that Defendant's investigator questioned Plaintiff and a 33-year-old white custodian about past judgments against them as part of their interviews. *Id*. at ¶¶ 36, 40-41. At some point around that time, Plaintiff complained to the school clerk that he felt he was being blamed for the missing iPads because of his race. See [71] (Additional Facts) at ¶ 27; [59-21] (M. Rodriguez-Hatfield Dep.) at 50:2–12. Ultimately, the iPads were not recovered and the investigation concluded that the technology coordinator at Goudy was the responsible party. [59-2] at ¶ 47; [71] (Additional Facts) at ¶ 12; see also [59-15] (Investigative Memorandum). The parties agree that, following the iPad investigation, the relationship between Plaintiff and Brandt, which the parties describe had been "a great professional relationship," deteriorated. [59-2] at ¶¶ 2, 31; [71] (Additional Facts) at ¶ 16. Also following the investigation, Plaintiff asked Rivera to "send him back to the West Side" because of the iPad accusations, although no transfer ultimately was effectuated at this time for administrative reasons. [71] (Additional Facts) at ¶ 29.

## 2. Plaintiff's 2012-2013 School Year Evaluation

In January 2013—during the iPad investigation—Rivera identified Plaintiff as one of his best engineers. Later, in June 2013, Rivera gave Plaintiff a performance evaluation, wherein he rated Plaintiff at 100%. [59-2] at ¶¶ 3–4. However, Plaintiff testified that at his performance review meeting, Rivera allegedly said that Plaintiff would not be promoted because of his age and race. [71] (Additional Facts) at ¶ 37; see also [59-5] (F. Gates Dep. I) at 80:14–16 ("He said, you will not be promoted because of your age and because you're black[.]").

### 3. Plaintiff's 2013 Transfer Efforts

Plaintiff applied for a promotion anyway. Defendant's buildings are ranked by size; the bigger the building, the higher the rank and, correspondingly, the higher the pay and rank for the assigned engineer or engineers. Engineer ranks included Class 3, Class 2, and Class 1, in that ascending order. During the years 2012–2014, to transfer from one school to another, engineers were required to submit bids to the union (Local 143), which "vetted" the bidding engineers and informed the relevant Facilities Managers which engineers could be interviewed. Facilities Managers were then provided with information on the bidding engineers, including their current position, current certifications, and last full performance evaluation. As relevant here, only Class 2 engineers were eligible to fill Class 1 engineer openings. [59-2] at ¶¶ 25, 27–28. As a further point, the engineer "Class" titles operated independently from the title of "Chief Engineer," which apparently fell out of use under the agreement between Defendant and the International Union of Operating Engineers in place beginning in 2012.[2]

By way of his work at Goudy, Plaintiff was a Class 3 engineer earning somewhere around $82,000 to $87,000 per year. In July and August 2013, Plaintiff applied for Class 2 engineer positions at approximately 11 or 12 of Defendant's schools.[3] See [59-6] (F. Gates Dep. II) at 35:16 ("Everything I bid was a promotion."). No position for which Plaintiff applied was a

---

[2] Although, if the title had been in use in 2013, Plaintiff would have been considered the Chief Engineer at Goudy, since the title automatically applied to any engineer appointed to a school with only one engineer. See [59-2] at ¶ 75.

[3] Plaintiff appears to claim that during this time period the bidding and vetting process was not conducted in the usual manner as described above. Instead, Plaintiff states, "[d]uring the bids of 2013, operation took control and threw out all of the rules. There was no more selecting the top five candidates. The decision was based upon who they liked and not the most qualified engineer." [71] (Additional Facts) at ¶ 8. This vague statement is problematic for many reasons, not the least of which is that it does not appear to be based on the Plaintiff's personal knowledge. Plaintiff does not explain anywhere in his filings to what or whom he is referring when he mentions "operation" in this statement, and the Court cannot tell if he is referencing the union or Defendant here. Accordingly, the Court cannot consider this statement in its analysis of this case.

Class 1 position nor were any of the positions under Rivera's supervision. [59-2] at ¶¶ 19, 22. Plaintiff received at least one interview. Specifically, he interviewed for a position at Englewood High School with Robert LeClerq, a facilities manager on the southwest side of the city, on or around July 18, 2013. Plaintiff was not offered this position. [71] (Additional Facts) at ¶ 39. Instead, Anthony Izzo, a white engineer born in 1978 (34-35 years old) was hired for the Englewood position.[4] [59-2] at ¶ 29. Ultimately, seven black, three white, and two Hispanic engineers were hired to fill the positions for which Plaintiff had applied. *Id.* at ¶ 21. Nine of the twelve engineers hired were over 40 years old. *Id.* at ¶ 29.

Plaintiff believes that Rivera interfered with his transfer prospects. Specifically, Plaintiff testified about the following conversation he had with LeClerq sometime in late 2014 (which was at the very least sixteen months after his interview for the Englewood position):

> Q. And did Mr. LeClerq say anything else to you?
>
> **A. Just – I asked him, I said why are you, why didn't he hire me when I interviewed; and he told me, he said your facility manager kept you from getting hired.**
>
> Q. Did he provide anymore specifics?
>
> **A. He didn't elaborate. He just told me, the only thing he said was that I was incompetent or unmanageable or some stuff, that's what he mentioned.**

[59-5] at 153:6–16; see also [71] (Additional Facts) at ¶ 22. For his part, Rivera testified that he was not aware that Plaintiff had submitted bids for a promotion or transfer and that he did not

---

[4] Although not mentioned in his Local Rule 56.1 fact statement, in his deposition, Plaintiff indicated that LeClerq also interviewed him for a position at Francis W. Parker Elementary Community Academy. [59-5] (F. Gates Dep. I) at 132:1–4. David Hernandez, a Hispanic engineer born in 1962 (50-51 years old) was hired for that position. [59-2] at ¶ 29.

provide any references for Plaintiff; accordingly, Defendant disputes Plaintiff's factual assertion. [59-2] at ¶ 26.[5]

### 4. Rivera's Comments

In the fall of 2013, Plaintiff alleges that Rivera began to act in an unprofessional and demeaning manner towards Plaintiff. At an August or September 2013 meeting between Rivera and Plaintiff, Rivera allegedly passed gas and then asked Plaintiff why he did not laugh. Rivera allegedly joked, "you know what they call that?" When Plaintiff said no, Rivera answered, "you call that a shit-sniffing nigger." [71] (Additional Facts) at ¶ 40; [59-5] (F. Gates Dep. I) at 127:2–10. Plaintiff claims that he called Rivera's supervisor and complained about this comment on September 16, 2013, although Defendant disputes that Plaintiff complained to Rivera's supervisor about anything "severe." [71] (Additional Facts) at ¶ 19; [80] at ¶ 19. According to Plaintiff, two days later, Rivera approached him at Goudy about Plaintiff's complaint. Rivera allegedly threatened to get Plaintiff fired. [71] (Additional Facts) at ¶ 20.

Two months later, on November 19, 2013, Rivera and Plaintiff again met at the school. Rivera yelled at Plaintiff and told him that he "will kiss the principal's ass to make her happy." Rivera threatened to write up Plaintiff (and thereby allegedly jeopardize his employment) if he

---

[5] Plaintiff also believes that Brandt interfered with his transfer prospects. In particular, Plaintiff testified that he believed that Brandt had encouraged Goudy's assistant principal to make a negative comment ("that Plaintiff's military service prevented him from being an outstanding engineer") to the principal of William Penn Elementary School who called presumably in connection with Plaintiff's application for a position there. *Id*. at ¶ 20; [59-5] (F. Gates Dep. I) at 152:7-16. Plaintiff does not explain how he came to possess such knowledge, other than stating that he somehow "know[s] for a fact" that the conversation happened, *id*., which is insufficient to demonstrate that he has the requisite personal knowledge about this conversation. In addition, the statement made by the assistant principal to the Penn principal appears to be double hearsay (at minimum) that is not subject to any exception, especially because the summary judgment record does not contain any evidence to suggest that providing references for engineers was in the scope of the assistant principal's employment duties. In any event, the statement is not material to the Court's decision on Defendant's motion because (1) Plaintiff admitted that he has no information that Brandt was in any way involved with his applications, see [71] at ¶ 20, and (2) he testified that the Penn principal was not a decisionmaker in this process. See [59-5] (F. Gates Dep. I) at 154:15-18 (the Penn principal "didn't make the decision at Penn. If it was left up to [her] I would have got the job at Penn.").

did not comply.  See [1] at Count III at ¶ 14 ("He told Plaintiff that 'you will kiss the principal's ass to make her happy' or he would write Plaintiff up"); [1-1] at 3 ("He told me that 'you will kiss the principal's ass to make her happy' or he would write me up, which would cause me to get a low evaluation and that I would then get fired.").  Plaintiff later testified that Rivera said that he would write Plaintiff's "black ass up."  See [59-2] at ¶ 57; [71] (Additional Facts) at ¶ 21.

### 5.    Plaintiff's Leave

Beginning in November 2013, Plaintiff took numerous leaves from work, including a one-week bereavement leave for his father's death in November, a one-month personal sick leave in December, Family Medical Leave Act leave in January and February "for his grandfather," and military-related leave from February 17, 2014 to March 14, 2014.  [59-2] at ¶ 7.  Plaintiff testified that he took the December 2013 leave to seek assistance from medical professionals and religious individuals after having homicidal thoughts about Brandt, Rivera, and the vice principal on account of their allegedly discriminatory and harassing conduct.  [71] (Additional Facts) at ¶ 32.

### 6.    Pre-Discipline Notices

Because of building problems at Goudy, Rivera prepared a pre-discipline notice for Plaintiff on December 2, 2013.  Generally, pre-discipline notices initiate conferences with the employee and his union representative to determine whether any discipline is warranted based on the items listed in the notice.  [59-2] at ¶ 6.  The December 2 notice listed four work orders from September, October, and November 2013 that Plaintiff had failed to complete in a timely fashion.  See [59-9] (12/2/2013 Notice of Pre-Discipline Hearing).  It is undisputed that Rivera did not actually issue a pre-discipline notice at this time.  Instead, after Plaintiff returned from his military leave, Rivera issued a pre-discipline notice dated March 17, 2014 that cited the same

four incomplete work orders. See [59-13] (3/17/2014 Notice of Pre-Discipline Hearing). The notice scheduled a hearing for March 20, 2014.

Unrelated to the pre-discipline notice, on March 19, 2014, Rivera asked Plaintiff to meet him in the school library. At this meeting, Rivera asked Plaintiff to sit down, but Plaintiff refused. [59-2] at ¶ 13. Rivera thereafter issued another pre-discipline notice to Plaintiff for insubordination, scheduling a hearing for March 25, 2014. See *id.*; [59-14] (3/19/2014 Notice of Pre-Discipline Hearing School-Based Personnel); see also [1] at Count III at ¶ 15 ("Rivera told him to sit down. When Plaintiff declined, Mr. Rivera wrote Plaintiff up for insubordination for refusing to sit."); [1-1] (EEOC Charge of Discrimination) ("I told him I did not want to sit down. He wrote me up for insubordination for refusing to sit."). Plaintiff later testified about this same meeting: "I said I don't want to sit down, Rafael. He said, well, I'm your boss. I'm ordering you to sit down. So I said I'm not going to sit down. He said I'm tired of you people. I said who are you referring to? He said, nigger, you know what I'm talking about. So I walked out of the library." See [71] (Additional Facts) at ¶ 28; [59-6] (F. Gates Dep. II) at 17:6–13.

On March 20, 2014, Plaintiff and a representative of Local 143 met with Rivera to discuss the March 17 pre-discipline notice. Immediately after the hearing and in front of the union representative, Rivera said or shouted to Plaintiff, "I need to see you," "I am your boss, get over here right now!" [59-2] at ¶ 11; [71] at ¶ 11; [71] (Additional Facts) at ¶ 24. Rivera then handed Plaintiff a list of projects that he needed to complete. Plaintiff told his union representative that he believed he was being discriminated against. [59-2] at ¶ 11. Ultimately, Plaintiff did not receive any discipline (*e.g.*, suspension or termination) on account of the pre-discipline notices or for any other reason from anyone at Goudy. *Id.* at ¶ 5.

### 7. Post-March 2014 Events

On the same day that the second pre-discipline hearing was scheduled (March 25), Plaintiff was injured at work and went out on worker's compensation leave until November 2014. Plaintiff believes that Rivera "tried to get him terminated" at some time after Plaintiff went on worker's compensation leave. [71] (Additional Facts) at ¶ 15. Specifically, Plaintiff testified that Rivera told an administrative employee that Plaintiff was working a second job at the same time be was being compensated by Defendant. *Id.*; see also [59-24] (4/8/2014 email thread between Rivera and Thomas Krieger). (It is undisputed that Plaintiff was working as a building engineer for the University of Illinois-Chicago at the same time.) Plaintiff was not terminated at this or any other time, and the record does not indicate that any action was taken on account of the email, besides sending an "AWOL letter" to Plaintiff. See [59-24].

As an additional matter, Rivera testified that at some point in 2013 his opinion of Plaintiff's job performance declined because Plaintiff was not completing his tasks as directed. See [59-10] (R. Rivera Dep.) at 83:20–84:12. Although the parties agree that Rivera never formally gave Plaintiff an evaluation for the 2013–2014 school year, Plaintiff testified that he believed that his personnel file contained an evaluation giving him a ranking of 56% to 58%. See [71] (Additional Facts) at ¶ 17; see also [59-6] (F. Gates Dep. II) at 19–20 (explaining that Plaintiff's knowledge of this performance evaluation was discovery in the current litigation).

Altogether, Plaintiff's various leaves meant that Plaintiff worked only 11 full days between November 5, 2013 and November 14, 2014. [59-2] at ¶ 10. After he returned from leave in November 2014, Plaintiff worked for the Southwest Collaborative, a roving crew of engineers that addresses issues at various of Defendant's schools on the southwest side of Chicago. See [59-5] (F. Gates Dep. I) at 29:1–30:8; see also *id.* at 152:20–153:5 (testifying that

he "kind of liked" "working on the Collaborative" and turned down an offer for a different position). In 2015, Plaintiff began working with the Far South Side Collaborative as a Class 2 engineer, earning somewhere between $94,000 and $97,000 per year. *Id.* at 21:5–22:14.

## C. Procedural History

Plaintiff did not file a formal internal complaint of discrimination with Defendant. [59-2] at ¶ 76. On April 14, 2014, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). [1-1]. Plaintiff signed and notarized the charge, declaring "under penalty of perjury that the foregoing is true and correct" and "swear[ing] or affirm[ing]" that the charge is "true to the best of [his] knowledge, information and belief." *Id.* at 2. The EEOC issued a Notice of Right to Sue on November 18, 2014. Plaintiff filed a five-count complaint on February 13, 2015 for unlawful discrimination in violation of the ADEA (Count I and Count II), racial discrimination in violation of Title VII (Count III[6]) and retaliation under the ADEA and Title VII respectively (Count IV and Count V[7]). As relief, Plaintiff seeks a promotion to "Chief Engineer" and compensatory damages for injury to his career, among other things. See [1].

On July 20, 2015, during the course of discovery in this case, Plaintiff answered Defendant's first set of interrogatories. Plaintiff verified the answers "under oath" as being "true and correct to the best of his knowledge." See [59-2] at ¶ 68; [59-7] ((Plaintiff's Answers to Defendant's Interrogatories), [59-8] (Verification). None of Plaintiff's pleadings, including his EEOC charge of discrimination, his federal complaint, and his verified answers to Defendant's

---

[6] In the complaint, this count is incorrectly labeled as Count II. For purposes of this opinion, the Court refers to the Title VII racial discrimination as Count III.

[7] In the complaint, these counts are incorrectly labeled as Count V and Count VII respectively. For purposes of this opinion, the Court refers to these counts as Count IV (ADEA retaliation) and Count V (Title VII retaliation).

interrogatories, include allegations that anyone had used racial epithets or referenced his age or race in any way despite the fact that such pleadings contain factual details and recitations of conversations. [71] at ¶¶ 58, 59, 61, 66; see also *id*. at ¶¶ 60, 61 (further confirming that Plaintiff's interrogatory answers had described specific discriminatory statements, but did not include the words "nigger," "black," "black ass," or "age"). Moreover, the summary judgment record does not indicate that Plaintiff amended or supplemented his interrogatory answers at any point. Plaintiff was deposed in this case on January 29, 2016 and again on March 9, 2016. At these depositions, Plaintiff "supplemented" his allegations about certain conversations he had with Brandt and Rivera to include previously "withheld" details, including racial epithets and other references to Plaintiff's age and race. See *id*. at ¶¶ 57, 63, 64. Defendant now moves for summary judgment on all five of Plaintiff's claims.

## II.     Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). Rule 56 makes clear that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. *Id*. In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor (here, Plaintiff). *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). But Plaintiff "is only entitled to the benefit of inferences supported by

admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Ind. Univ.*, -- F.3d --, 2017 WL 3753996, at *3 (7th Cir. Aug. 31, 2017) (citation and quotation marks omitted). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 324.

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007). In other words, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. 252.

### III.    Analysis

#### A.    Plaintiff's Deposition Testimony

The Court first addresses Defendant's arguments that certain portions of Plaintiff's deposition testimony should be disregarded.  Specifically, Defendant challenges four specific statements or conversations that were described differently in Plaintiff's deposition than they had been previously:  (1) a February 2013 statement by Brandt, (2) Rivera's August or September 2013 "joke," (3) a November 2013 statement by Rivera, and (4) a March 2014 statement by Rivera.  See [59-1] at 9–10.

Although a "party may attempt to clarify or augment (but not contradict) prior deposition testimony through affidavits," *Howell v. Smith*, 853 F.3d 892, 899 n.18 (7th Cir. 2017) (quoting *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002)), under what is known as the "sham affidavit rule," "[p]arties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict prior depositions."  See *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996); see also *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2012); *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 750–51 (7th Cir. 2010) (sham-affidavit rule "is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised").  A "sham" affidavit involves "contradictions so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment."  *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015).  This rule is applied with "great caution," as so not to usurp the fact finder's role in making credibility determinations.  *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016).

"Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony, and thus the sham-affidavit rule applies only when a change in testimony is incredible and unexplained, not when the change is plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory." *Id*. at 907 (internal quotation marks omitted); see also *McCann*, 622 F.3d at 750–51; *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999) ("[c]ourts generally ignore attempts to patch-up potentially damaging deposition testimony with a supplemental affidavit unless the party offers a suitable explanation—*e.g.*, confusion, mistake or lapse in memory—for the discrepancy").  Courts have extended this rule to disregard affidavits that contradict interrogatory answers and also new deposition testimony that contradicts prior sworn statements.  See *Donohue v Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1136 n.4 (7th Cir. 1992) (affirming district court's refusal to consider an affidavit which contradicted earlier responses to an interrogatory); *Vonckx v. Allstate Ins. Co.*, 2004 WL 1427105, at *4 n.7 (N.D. Ill. June 23, 2004) ("Seventh Circuit precedent teaches that a litigant cannot attempt to create a factual issue so as to forestall summary judgment by contradicting prior sworn testimony through so-called sham affidavits and new deposition assertions.") (citations omitted); see also *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (refusing to consider deposition testimony that flatly contradicted prior representations on disability benefit forms).

Plaintiff does not dispute that his testimony about discriminatory statements made by Brandt and Rivera has evolved over the course of this litigation.  The Court first examines Plaintiff's accounts of the three statements made by Rivera.  Plaintiff's charge of discrimination, complaint, and interrogatory responses all reference the interactions between Plaintiff and Rivera in November 2013; the charge and the complaint also reference the library meeting in March

2014.  In his deposition, Plaintiff added racial references and/or epithets to those two conversations and described a third, previously undescribed conversation where Rivera told a joke that contained a racial epithet.

To be sure, the fact that Plaintiff now asserts that Rivera said such words is inconsistent with his prior sworn statements where he did not mention the inflammatory words in the described conversations and where he did not even mention the racially charged joke at all.  But even though the Court views Plaintiff's late disclosure of such pertinent information as troubling and finds Plaintiff's explanations of the inconsistencies dubious (as explained below), the Court concludes that these three instances are not the kinds of contradiction that warrant application of the sham affidavit rule.  The rule is only applied in circumstances where the contradiction between the earlier sworn testimony and the latter is clear and unmistakable.  *Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc.*, 486 F. Supp. 2d 855, 857 (W.D. Wis. 2007) ("[T]he sham affidavit rule is limited to blatant contradictions, not elaborations or ambiguous testimony that the other party failed to clarify during a deposition."); see also *Mayenschein v. WS Packaging Group Inc.*, 2016 WL 6989785, at *7 (W.D. Wis. Nov. 29, 2016).  Here, the Court does not find that Plaintiff's differing and augmented accounts of Rivera's statements to be fundamentally inconsistent; all of his accounts of the conversations could be true.  Therefore, the fact that Plaintiff has changed his testimony is an issue that bears on Plaintiff's credibility at trial and the Court will not disregard Plaintiff's deposition testimony concerning Rivera's statements.

The Court reaches a different conclusion, however, with regard to Plaintiff's different accounts of the February 2013 conversation he had with Brandt regarding the investigation into the missing iPads.  Plaintiff first relayed, in both his EEOC charge of discrimination and his complaint, that he "was wrongly accused of stealing" by Brandt.  See, *e.g.*, [1] at Count III at

¶ 12; [1-1] at 3.  Later, when asked through interrogatories propounded by Defendant to identify all individuals who discriminated against Plaintiff and how, Plaintiff gave the following verified response:  Brandt "accused Plaintiff of stealing and *she based her accusation on the fact that Plaintiff had a judgment against him and he had previously filed for bankruptcy*."  See [59-7] at 2 (emphasis added).  But then Plaintiff testified in his deposition that Brandt had given a different reason for accusing him of the suspected iPad theft:  because he was black.  This is not an instance of simply augmented testimony (as discussed above), and Plaintiff's deposition testimony does nothing to clarify his earlier statements.  The Court thus agrees with Defendant that Plaintiff's changed statements concerning this conversation are in direct conflict:  either Brandt said that she thought Plaintiff was involved with the missing iPads because he had a judgment against him and he had previously filed for bankruptcy or she said that her suspicions were based on the fact that he was black.  Accordingly, Plaintiff must offer a suitable explanation for his change to the latter statement before the Court properly may consider it as part of the summary judgment record.

As previously noted, the Seventh Circuit has listed confusion, mistake, and lapse of memory as suitable explanations.  See *Funds in the Amount of $271,080*, 816 F.3d at 907. Plaintiff offers three explanations; the closest he comes to offering a suitable explanation involves his memory.  In particular, Plaintiff argues that he did not disclose the pertinent details in his prior statements and interrogatory answers because "he did not want to remember them" because he is dealing with "severe emotional issues * * * including having homicidal thoughts" about Rivera and Brandt.  See [72] at 8–9.  This explanation is not the type of "lapse of memory" contemplated by the sham affidavit rule, and it is not an acceptable excuse here.  Plaintiff is reminded that *he* made the decision to file this lawsuit, and in so doing, he undertook the

obligation to participate fairly in discovery. Although Plaintiff may wish to steer clear of facts that affect his emotional state during the prosecution of his case, he may not surprise Defendant with a late disclosure of such facts and then rely on them to survive summary judgment.

Plaintiff's second excuse—that he was "in a hurry" and apparently did not have time to add the relevant details to his prior filings—fails for the same reason, namely that it is unfair to punish Defendant for Plaintiff's discovery deficiencies. Finally, Plaintiff argues that he strategically withheld the details until a time when he could fully explain them, apparently so that other witnesses could not deny his allegations. Not only is this not an acceptable reason to allow Plaintiff's contradictory testimony, it is an improper abuse of the rules governing discovery that the Court cannot condone. Plaintiff's behavior in not timely "put[ting] all of [his] cards on the table" during discovery in this matter is unacceptable, and the Court cannot allow Plaintiff to benefit from this tactic. See [59-5] (F. Gates Dep. I) at 80:21–81:4. For all of these reasons, the Court disregards Plaintiff's deposition testimony regarding Brandt's statement to him about the iPad investigation. See also *Kennedy*, 90 F.3d at 1481 (where plaintiff represented on disability claim forms that she was totally disabled and then later in a deposition in support of an ADA claim testified that she was *not* totally disabled, the court disregarded the deposition testimony in its summary judgment analysis as "uncorroborated," "self-serving," and "flatly contradict[ory]" and therefore insufficient to create a genuine dispute regarding plaintiff's disability status).

### B. Age and Race Discrimination (Counts I, II, and III)

Title VII provides that "it shall be an unlawful employment practice for an employer * * * to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Similarly, the ADEA protects individuals 40 years of age or older from employment discrimination based on age.  29 U.S.C. § 623.

To prove discrimination under either Title VII or the ADEA, a plaintiff must establish that he suffered an adverse employment action that was motivated by discriminatory animus.  See *Carson v. Lake Cty., Ind.*, 865 F.3d 526, 532 (7th Cir. 2017) ("A plaintiff seeking to recover for disparate treatment under the ADEA must 'prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action.'") (quoting *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 180 (2009); *Fleishman v. Continental Casualty Co.*, 698 F.3d 598, 603 (7th Cir. 2012)); *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007) (an unlawful employment practice under Title VII is established when a plaintiff demonstrates that a protected characteristic, such as race, was a motivating factor for an employment decision); see also *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) ("We apply the same analytical framework to employment discrimination cases whether they are brought under the ADEA or Title VII.").

As set forth above, Plaintiff points to actions by Defendant's agents that he believes represent discriminatory treatment of him as a black man over the age of 40.  As a preliminary matter, however, the parties dispute whether Plaintiff suffered an adverse employment action.

### 1.    Adverse Employment Action

An adverse employment action is "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (alteration in original) (internal citation omitted); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) (a

plaintiff must identify a "quantitative or qualitative change in the terms or conditions of employment"). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.–Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). In the context of a claim for employment discrimination, an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007) (internal quotation marks and citation omitted). "Generally speaking, there are three categories of actionably adverse employment actions: '(1) termination or reduction in * * * financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.'" *Hopkins v. Bd. of Educ. of City of Chicago*, 73 F. Supp. 3d 974, 989 (N.D. Ill. 2014) (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011)). Plaintiff argues that suffered at least three adverse employment actions: (1) he did not receive a promotion when he applied to 11 or 12 other schools in July and August 2013; (2) he was written up in March 2014 and given a low performance rating sometime later in that year; and (3) he was subjected to a hostile work environment. See [72] at 10–13, 19–21.

### a. Failure to Promote

Failure to promote claims are only actionable if not receiving the position is a "materially adverse" employment action. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016) (citing *Carter v. Chi. State Univ.*, 778 F.3d 651, 660 (7th Cir. 2015)). Generally, this means that the position for which the plaintiff was rejected offered markedly greater compensation,

responsibilities, or title. *Id.* at 892–93 (citing *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 465–66 (7th Cir. 2002)). Here, in large part, Plaintiff has not developed evidence of how the 11 or 12 engineer positions at other schools offered a significant pay raise, increase in responsibilities, or boost in title. However, through his deposition, Plaintiff offered testimony (which is not contained in his Local Rule 56.1 statement) that he applied for Class 2 positions that he believed would have entailed a pay raise of $8,000 to $11,000 annually above what Plaintiff testified was the high end of the Class 3 pay range. See [59-6] (F. Gates Dep. II) at 30:16–32:10.

In arguing that Plaintiff has failed to prove that his failure to be promoted was an adverse employment action, Defendant focuses its attention on Plaintiff's specific language in an attempt to defeat this claim. Specifically, Defendant argues that Plaintiff could not have been "passed over for promotion to 'Chief Engineer'" because that term was no longer in use in 2013 and, as the sole engineer at Goudy during his tenure there, he would have been considered a "Chief Engineer" anyway. Defendant further argues that Plaintiff (as a Class 3 engineer) has no claim that he was not promoted to Class 1 engineer when he neither applied for a Class 1 position nor was qualified to do so under the terms of the collective bargaining agreement in place at the time. See [59-1] at 5–6. Although technically correct, Defendant's arguments miss the point. Drawing all reasonable inferences in Plaintiff's favor at this stage as the Court must, Plaintiff has provided at least some evidence that his rejection for promotion to the higher paying Class 2 engineer positions constituted an adverse employment action.[8] Cf. *Evans v. Ill. Dep't of Human*

---

[8] At times, Defendant describes Plaintiff's applications not as applications for promotions but for lateral transfers. Although the "denial of a lateral transfer request, without additional indicators such as a change in salary, benefits, or material responsibilities, is not a sufficiently adverse employment action," *Evans*, 2017 WL 2590754, at *3 (citing *Benedict v. Eau Claire Pub. Schs.*, 1998 WL 60374, at *8 (7th Cir. Feb. 10, 1998); *Han v. Whole Foods Mkt. Grp., Inc.*, 44 F. Supp. 3d 769, 787–788 (N.D. Ill. 2014) (holding that failure to grant lateral transfer requests was not an adverse action)), as the Court has already noted, Plaintiff testified that the positions for which he applied were "promotions" that involved a higher ranking and a pay raise, *i.e.*, they were not lateral transfers.

*Servs.*, 2017 WL 2590754, at *3 (N.D. Ill. June 15, 2017) (finding conclusory statements that the positions for which the plaintiff applied were "higher level" insufficient to establish that her failure to obtain them was a materially adverse employment action).

### b. Pre-Disciplinary Notices & Evaluations

Plaintiff also contends that his two "write-ups" and lower performance evaluation rating constitute adverse employment actions. See [72] at 20. As discussed above, to show an adverse employment action, Plaintiff must identify a "quantitative or qualitative change in the terms or conditions of employment." *Haywood*, 323 F.3d at 532. In the case of a reprimand or negative performance evaluation, the discrimination must lead to some tangible job consequence. *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004) ("There must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action."); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) (same); see *Johnson v. Johnson & Johnson*, 67 F. Supp. 3d 1001, 1010 (N.D. Ill. 2014) (attendance warning did not constitute adverse employment action because it did not result in any tangible consequences). Looking first at the pre-discipline notices, the only consequence Plaintiff faced for not timely completing certain work orders (the basis of the March 14 pre-discipline notice) was a discussion about whether discipline should be imposed. This is not considered discipline. *Lollis v. Donahue*, 2012 WL 33005, at *5 (N.D. Ill. Jan. 6, 2012) (in retaliation context, noting that a "pre-disciplinary interview is not an adverse employment action as a matter of law"). Moreover, no pre-discipline hearing was ever held concerning Plaintiff's insubordination (the March 19 pre-discipline notice).

Plaintiff quotes (without properly citing) dicta from *Whittaker v. N. Ill. Univ.*, 424 F.3d 640 (7th Cir. 2005), in support of his argument that his written reprimands were adverse actions.

See [72] at 20; *Whittaker*, 424 F.3d at 648 ("we can conceive of reprimands that carry with them immediate, albeit non-economic, consequences that in and of themselves go so far as to materially alter the terms and conditions of employment" such as ineligibility for benefits, transfer, or increased responsibilities). That case, however, supports the conclusion that the two pre-discipline notices Plaintiff received are *not* adverse employment actions. Although the plaintiff in that case received a negative evaluation, written warnings, and was required to produce additional information in connection with her requests for sick leave, the Seventh Circuit found that these putative disciplinary measures did not result in any tangible job consequences. Therefore, they were not adverse employment actions. *Id.* at 648. So too here. It is undisputed that no actual discipline followed either pre-discipline notice issued to Plaintiff. See *Burrell v. United Parcel Serv., Inc.*, 163 F. Supp. 3d 509, 526 (N.D. Ill. 2016) (no adverse employment action where plaintiff testified that being written up for attendance infractions did not result in suspension, demotion, termination, loss of pay, or other change). In fact, Plaintiff admits that he was never disciplined at any time by anyone associated with Goudy. Additionally, Plaintiff has not adduced evidence or articulated any argument concerning any other consequences of the notices.[9] See *Elue v. City of Chicago*, 2017 WL 2653082, at *7 (N.D. Ill. June 20, 2017) (in retaliation context, "allegations of threatened discipline do not constitute an adverse employment action * * * because they are not tied to a tangible job consequence").

Plaintiff's argument that he received one negative performance evaluation similarly fails. Defendant correctly points out that a negative performance review is generally not an adverse

---

[9] Plaintiff argues that Rivera tried to get him fired after he went out on workers' compensation leave in March 2014. But Plaintiff was not fired. The record reflects only that Plaintiff was issued an AWOL notice at this time, and he does not allege that he suffered any tangible employment consequences on account of Rivera's complaint or the AWOL notice. Accordingly, to the extent that Rivera's email can be considered a form of discipline or a "write up," it does not constitute an adverse employment action.

action by itself. See *Smart v. Ball State Univ.*, 89 F.3d 437, 442–43 (7th Cir. 1996); *Elue*, 2017 WL 2653082, at \*7 (to be actionable, negative performance evaluations must occur in tandem with some other tangible job consequence, such as an effective demotion); accord *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010); *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002). Although Plaintiff argues that the alleged negative performance review for the 2013-2014 school year was adverse, he does not link that evaluation with any tangible employment consequence.[10] Because Plaintiff has not shown that the pre-discipline notices or negative performance evaluation caused any sort of real harm to his compensation, terms of employment, benefits, or privileges, Plaintiff has failed to show that he suffered an adverse employment action on this basis.

c.        **Hostile Work Environment**[11]

Unbearable changes in an employee's job conditions, such as a hostile work environment, can also be considered an adverse employment action. Employers are prohibited from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). An employee may demonstrate a hostile work environment by providing sufficient evidence that demonstrates: "(1) that the work environment was both

---

[10] Indeed, Plaintiff has since been promoted to Class 2 engineer, he testified that he was happy with his position in the Collaborative, and he only seems to have learned about this evaluation through fact discovery in the present case.

[11] Because Counts IV and V contain allegations that Plaintiff was harassed, Defendant reads claims for hostile work environment into those counts, which are unambiguously titled "Retaliation." See [59-1] at 9 (Plaintiff "claims he was harassed due to his race and age, which is presumably a claim of hostile work environment."). In fact, Counts I, II, III, IV, *and* V all contain an allegation that Defendant harassed Plaintiff, but none of these claims independently raise a claim for hostile work environment. Moreover, a hostile work environment claim would be time-barred at this point (unless it relates back to Plaintiff's original claims—an analysis in which the Court will not engage *sua sponte*), and Plaintiff does not indicate in his response where or how such a claim is pled. Accordingly, although the Court does not consider the complaint to independently raise a claim for hostile work environment, it analyzes whether Defendant's actions created a hostile work environment for Plaintiff as part of its analysis of whether Plaintiff suffered an adverse employment action.

subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). In determining whether an environment is hostile, "a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Whittaker*, 424 F.3d at 645 (quotations and citation omitted). Indeed, the threshold for plaintiffs is high, as "[t]he workplace that is actionable is one that is 'hellish.'" *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997).

In his brief, Plaintiff alleges that Rivera was the main source of harassment. [72] at 11. Plaintiff focuses on the subjective offensiveness of the work environment, referencing the homicidal thoughts that he claims were a result of the environment Rivera created. *Id.* at 10–11. "A workplace is subjectively offensive when the plaintiff actually perceives it as such; it is objectively offensive when a reasonable person would find it hostile or abusive." *Duncan v. Thorek Mem'l Hosp.*, 784 F. Supp. 2d 910, 919–20 (N.D. Ill. 2011) (citing *Ezell v. Potter*, 400 F.3d 1041, 1047–48 (7th Cir. 2005)). The Court agrees that Plaintiff has produced sufficient evidence to demonstrate that Rivera's comments were subjectively offensive. However, even when looking at the evidence in the light most favorable to Plaintiff, the Court cannot conclude that the level of harassment Plaintiff experienced was severe or pervasive enough to alter the terms and conditions of his employment.

Generally, hostile comments do not qualify as actionable adverse employment actions unless the hostility was severe or pervasive. *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002). It is important to note that the harassing conduct does not need to be both severe

*and* pervasive. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). One instance of conduct that is sufficiently severe may be enough. *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678 (7th Cir. 2001). Conversely, separate incidents that are not individually severe may trigger liability because they frequently occur. *Jackson*, 474 F.3d at 499. The key inquiry is whether the conduct was so severe or pervasive that it altered the conditions of the employment relationship. *Id.*

First, the conduct of which Plaintiff complains was not "frequent." Plaintiff worked at Goudy from 2010 to 2014, and he has only identified on summary judgment three racial slurs that were directed towards him during that time (although the comments were made in a six-month period). The statements at issue here are comments made by Rivera to Plaintiff while no one else was around: (1) Rivera's September 13, 2013 "joke" that contained the N-word; (2) Rivera's November 19, 2013 threat to write Plaintiff's "black ass up"; and (3) Rivera's March 19, 2014 "you people"/N-word comment. While the Seventh Circuit has stated that while there is no "magic number of slurs" that indicates a hostile work environment, an "unambiguously racial epithet falls on the 'more severe' end of the spectrum." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002); see also *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004) ("Given American history, we recognize that the word 'nigger' can have a highly disturbing impact on the listener."); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (citation and internal quotation marks omitted).

Still, while referring to colleagues with such disrespectful language is deplorable, courts in this and other circuits generally have held that one or two utterances of the N-word are not severe or pervasive enough to rise to the level of establishing liability absent an unusually severe, physically threatening, or humiliating incident. See *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (holding that while calling a black coworker a "black n——r" was "deplorable" with "no place in the workforce," one instance—even when accompanied by other harassing incidents within the same two-week period—was not sufficiently severe or pervasive to support a hostile environment claim); *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (stating that "the mere utterance of an * * * epithet which engenders offensive feelings in an employee" does not necessarily violate Title VII even though the plaintiff was referred to, but not in his presence, as a "black motherf——er"); *Roberts v. Fairfax Cty. Pub. Sch.*, 858 F. Supp. 2d 605, 609 (E.D. Va. 2012) (two isolated uses of a racial epithet are insufficient to meet the "severe and pervasive" prong of a hostile work environment claim).[12] An increase in that frequency, however, has been found to be actionable. See *Rodgers*, 12 F.3d at 675 (five to ten instances of referring to an employee as a "nigger" sustained a hostile work environment claim); *Shanoff v. Ill. Dep't of Human Serv.*, 258 F.3d 696, 698–99 (7th Cir. 2001) (repeated harassment on the basis of employee's race/religion, including referring to employee as a "haughty jew," and stating "I know how to put you jews into place," supported claim).

---

[12] See also *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (use of the epithet "nigger" on one occasion by a Caucasian coworker insufficient to demonstrate severe or pervasive action creating a hostile work environment); *Sanders v. Village of Dixmoor*, 178 F.3d 869, 870 (7th Cir. 1999) (use of the epithet "nigger" on one occasion during an altercation not sufficiently severe or pervasive to create an objectively hostile work environment); *Kelly v. Senior Centers*, 169 F. App'x 423, 429 (6th Cir. 2006) (finding that use of the terms "nigger," and "token black," coupled with three racist jokes did not create a hostile work environment); *Mosley v. Marion County*, 111 F. App'x 726, 728 (5th Cir. 2004) (per curiam) (holding that evidence of three incidents involving racial slurs was insufficient to support a hostile work environment claim).

Here, Plaintiff presents no evidence that he was subjected to this type of offensive conduct more than three times over a span of approximately six months (two uses of the N-word and one reference to his "black ass").  Plaintiff also has not indicated that these incidents were particularly "severe," physically threatening, or humiliating.  "Although Title VII does not guarantee a happy workplace, it does provide protection for employees who suffer from discriminatory terms and conditions of employment through a work environment that is ***permeated*** with racial epithets that are tolerated by the employer."  *Cerros*, 288 F.3d at 1047–48 (emphasis added).  The Court therefore concludes that Rivera's usage of racial epithets, assuming that it occurred as Plaintiff testified, is not sufficient to demonstrate a hostile work environment on its own because Rivera's comments were isolated and infrequent and it is undisputed that Plaintiff's in-person contact with Rivera was infrequent (see p. 5, *supra*).  See *Whittaker*, 424 F.3d at 645 ("th[is] behavior, while questionable, was relatively isolated, and alone not actionable"); see also *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (explaining that "lamentably inappropriate" behavior did not create a hostile work environment "due to the limited nature and frequency of the objectionable conduct"); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (a total of eight gender-based comments over the term of the plaintiff's employment did not constitute pervasive harassment); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("The infrequency of the offensive comments is relevant to an assessment of their impact.  A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."); *North v. Madison Area Ass'n for Retarded Citizens–Development Ctrs. Corp.*, 844 F.2d 401, 409 (7th Cir. 1988) (exposure to one or two isolated epithets not sufficient to constitute hostile work environment); *Poullard v. Shinseki*, 2015 WL 1428105, at *11 (N.D. Ill. Mar. 26,

2015), aff'd, 829 F.3d 844 (7th Cir. 2016) (three incidents in which plaintiff experienced racial slurs and comments based on his sex were isolated in time, and plaintiff did not show that the comments were physically threatening or that they unreasonably interfered with his work performance).

Moreover, the remainder of the harassing conduct to which Plaintiff points also does not rise to this level. In particular, Plaintiff references his feelings that Brandt's iPad investigation was unfair, the "demeaning and unprofessional" manner in which Rivera spoke to Plaintiff at times, and the fact that Rivera issued him two pre-discipline notices. But Plaintiff has not offered anything other than his own belief and speculation that he was "wrongly accused" and improperly investigated regarding the missing iPads on account of his race, *Grant*, 2017 WL 3753996, at *3 (plaintiff is not entitled to inferences based only on speculation or conjecture), and although Plaintiff argues that the pre-discipline notices were "unfounded," Plaintiff has not put forth any evidence to suggest that the notices were merely pretextual. In addition, although the record reflects that Plaintiff's relationship with Rivera deteriorated over time, federal civil rights laws do not impose a "civility code," *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009), and (again) the record indicates that Plaintiff and Rivera only had limited interactions over the course of Rivera's supervision of Plaintiff at work.

Finally, although Plaintiff's emotional disturbance and subsequent leave to seek medical treatment support an inference that Plaintiff's environment adversely affected his job performance for a time,[13] the record also reflects that Plaintiff is still employed by Defendant and that he since has been promoted to Class 2 engineer. Ultimately, the Court does not find that

---

[13] Because Plaintiff was out of work for various other reasons from January 2014 to November 2014, including FMLA leave on account of a family member, military leave, and worker's compensation leave, the record is not clear regarding how long such events interfered with Plaintiff's work.

Plaintiff established that he experienced a "hellish" or abusive workplace that was permeated with discriminatory intimidation, ridicule, and insult so as to change the conditions of Plaintiff's employment. *Harris*, 510 U.S. at 21–22. Although there is no place in any workplace for the offensive behavior that Plaintiff allegedly experienced, including even the infrequent use of racial slurs, Plaintiff has failed to present sufficient evidence to demonstrate that he was subjected to conduct that created unbearable changes in his job conditions amounting to a hostile work environment under the controlling law. As such, the only adverse employment action that Plaintiff established is one based on Defendant's failure to promote him to Class 2 engineer at 11 or 12 other schools in July and August 2013.

### 2. Discriminatory Motive

Next, Plaintiff must put forth competent evidence that Defendant failed to promote him because of his age or that his race was a factor in this action, *i.e.*, that Defendant had a discriminatory intent. In *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760, 763–66 (7th Cir. 2016), the Seventh Circuit abandoned the long-standing practice of distinguishing between the "direct" versus "indirect" methods of analyzing employment discrimination claims. Instead, *Ortiz* instructs that the "legal standard" that courts must apply "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's * * * proscribed factor caused the discharge or other adverse employment action." *Id*. at 765. Thus, the "sole question" that must be answered is simply: could a reasonable jury find based on all evidence that Plaintiff would have been promoted "if he was a different ethnicity, and everything else had remained the same"? *Id*. at 764. The Court is to consider the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Id*. at 765.

Plaintiff views this case as straightforward. He argues that the fact that he was not selected for any of the positions to which he applied, coupled with Rivera's discriminatory remarks, "adds up to discriminatory intent." [72] at 17. It is undisputed that Rivera was not a decisionmaker on any of the bids or applications Plaintiff submitted. However, Plaintiff contends that Rivera, who allegedly said in June 2013 that Plaintiff would not be promoted on account of his age or race and made other racially charged comments later on, influenced LeClerq, the decisionmaker for one of the positions to which Plaintiff applied (*i.e.*, the "cat's paw" theory of liability).

Under the cat's paw theory of liability, when a biased subordinate who lacks decision-making authority uses a formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action, the biased subordinate's actions are evidence of discrimination. *Grant*, 2017 WL 3753996, at *5 (citation and quotations omitted). This theory requires Plaintiff to show that Rivera "actually harbored discriminatory animus against him[.]" *Nichols*, 755 F.3d at 599. Assuming that Plaintiff has done so based on the various statements he alleges Rivera to have made, Plaintiff needs to show that the facilities managers or other relevant decisionmakers based their actions on advice from Rivera. In this regard, the only evidence offered by Plaintiff that Rivera had any role in this process is with one of his 11 or 12 applications—his application to work under LeClerq at Englewood High School. That is where Rivera's alleged statement to LeClerq comes into play, which Plaintiff argues is evidence that Rivera "interfered with the hiring process and prevented [Plaintiff] from being hired." [72] at 19. The Court, however, will not consider this statement for evidentiary reasons.

The Federal Rules of Evidence provide that a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted is

inadmissible hearsay.  Fed. R. Evid. 801(c); *Baron v. City of Highland Park*, 195 F.3d 333, 339 (7th Cir. 1999); see also *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("To be considered on summary judgment, evidence must be admissible at trial."); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (same).  The out-of-court statement at issue here was made by LeClerq and is offered by Plaintiff "to prove the truth of the matter asserted," that is, that Rivera did in fact say what LeClerq much later reported to Plaintiff.  This double hearsay has no indicia of reliability.  See *Baron*, 195 F.3d at 339 (comment by plaintiff's coworker that plaintiff's superior made a discriminatory comment was inadmissible to support plaintiff's ADEA claim); *Cooksey v. Bd. of Educ. of City of Chicago*, 17 F. Supp. 3d 772, 786 n.21 (N.D. Ill. 2014) (statement that someone told plaintiff that an alleged discriminator had made discriminatory statements was inadmissible hearsay).  For his part, Plaintiff does not offer any hearsay exceptions.  Defendant focuses on the admissibility of *Rivera's* statement as a statement by a party-opponent's agent or employee under Rule 801(d)(2)(D), but the Court must focus on the "outer layer" of hearsay, *i.e.*, *LeClerq's* statement about what Rivera said about Plaintiff at least sixteen months earlier.  See *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 824–25 (7th Cir. 1999).  The Court finds that LeClerq's recount of Rivera's statements does not qualify under Rule 801(d)(2)(D).[14]

---

[14] Even if LeClerq's statement were admissible, it is too vague to create a factual dispute as to whether Defendant acted with a discriminatory motive in failing to promote Plaintiff.  As Defendant points out, Plaintiff's testimony is not clear as to what Rivera said versus what LeClerq said.  Although Plaintiff attempts to rectify this ambiguity by simply attributing all of the words to Rivera, Plaintiff cannot rearrange his testimony in such a way to defeat summary judgment.  The testimony was that LeClerq mentioned that Plaintiff was "unmanageable or incompetent or some stuff."  In addition, to withstand summary judgment, Plaintiff must point to evidence suggesting that Rivera *improperly* influenced a decisionmaker.  Plaintiff's deposition testimony phrasing dodges this issue, particularly where record evidence suggests that, although Rivera initially thought Plaintiff was one of his best engineers, Rivera believed that Plaintiff's performance deteriorated during 2013.

Without any connection to the decisionmakers on Plaintiff's 11 or 12 applications, Rivera's discriminatory comments constitute only stray remarks (most of which were made after the adverse employment action) by a nondecisionmaker, which are "insufficient to establish discriminatory motivation." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016); see also *Overly v. KeyBank Nat. Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011) (stray remark after resignation was not evidence of discrimination); *Nichols*, 510 F.3d at 781–82 (holding "stray remarks that are neither proximate nor related to the employment decision [at issue] are insufficient to defeat summary judgment") (internal citation and quotation marks omitted). Outside of the inadmissible statement that Rivera allegedly made to LeClerq, Plaintiff has failed to put forth any admissible evidence that any of the decisionmakers on his efforts seeking promotion either harbored a discriminatory motive or were influenced by someone who harbored such a motive.

Although Plaintiff only argues that he has put forth direct evidence of discrimination, the Court also views the evidence in the record cumulatively in its analysis. Other types of evidence a court considers in deciding whether there is a triable issue of fact on the question of the Defendant's discriminatory intent include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). In addition, to establish a claim for failure to promote generally, a plaintiff needs to show that he applied for and was qualified for a position, that he was rejected for the

position, and someone outside plaintiff's protected class who was not better qualified obtained the position. *Riley*, 829 F.3d at 892.

Consideration of the record as a whole cuts against Plaintiff's claims of discrimination. Specifically, the record reflects that only five of the engineers hired for the open positions were non-black, and three of those hired were under 40 years old, indicating that similarly situated employees outside of Plaintiff's protected groups statistically did not receive better treatment. In addition, Plaintiff has not put forth any evidence to show that (1) he was qualified for all of the positions for which he applied, and (2) someone less qualified was hired for the position. Although the record reflects that Anthony Izzo, under-40 and white, was hired for the Englewood position, that fact alone does not show that Defendant's decision was improperly motivated. Plaintiff does not even attempt to challenge that decision by arguing that Izzo was unqualified. In total, the Court concludes that a reasonable factfinder could not conclude that Defendant discriminated against him on account of his age or race when he was not promoted to any of the Class 2 engineer positions to which he applied in the summer of 2013. Defendant's motion for summary judgment on Count I, Count II, and Count III is granted.

## C. Age and Race Retaliation (Counts IV and V)

In Counts IV and V of his complaint, Plaintiff complains that he was retaliated against in violation of the ADEA and Title VII. Title VII and the ADEA prohibit an employer from retaliating against an employee for asserting her right to be free from discrimination under those statutes. 42 U.S.C. § 2000e–3(a); 29 U.S.C. § 623(d). To prevail on an unlawful retaliation claim, Plaintiff "must prove three elements: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th

Cir. 2005). Plaintiff argues that Defendant retaliated against him by engaging in the same adverse employment activities as discussed in Section B above: (1) failing to promote him, and (2) issuing him two pre-discipline notices. [72] at 13–16.

Looking first to the protected-activity element, "[f]or purposes of retaliation claims, statutorily protected activity generally consists of either an employee filing a charge with the EEOC or opposing any practice made unlawful under 42 U.S.C. § 2000e–3(a)." *Nielson v. Acorn Corrugated Box Co.*, 2002 WL 1941365, at *4 (N.D. Ill. Aug. 21, 2002). "Communicating discriminatory workplace conduct to an employer constitutes not only protected activity but opposition to the activity as well." See *Duncan*, 784 F. Supp. 2d at 925 (citing *Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271, 276 (2009)). However, for a complaint to be considered protected activity, it must be "more than simply a complaint about some situation at work, no matter how valid the complaint might be." *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016). The complaint instead must indicate discrimination on the basis of membership in a protected class. *Id.*

The only statutorily protected activity that Plaintiff indicates that he engaged in is his September 2013 oral complaint to Bilquis Jacobs-El regarding Rivera's racially charged joke. Although not raised by Plaintiff, the Court notes that his filing of an EEOC charge of discrimination also constitutes statutorily protected activity.[15] Having demonstrated a protected activity, Plaintiff must present evidence of an adverse action and a causal connection between that action and his protected activity. The Court has already determined in Section B above that

---

[15] Although Plaintiff's complaint alleges that he complained to Brandt that he was being discriminated against, see [1] at Count IV ¶ 15 & Count V ¶ 15, Plaintiff does not mention these alleged complaints in his response brief or his statement of additional facts, and the Court has not found evidence of these alleged complaints in the summary judgment record before it. In addition, Plaintiff's response mentions his complaint to the school clerk about what he perceived to be the racially charged iPad investigation, but the Court notes that this does not constitute a protected activity. *Duncan*, 784 F. Supp. 2d at 925 n.6.

the only adverse employment action that Plaintiff can demonstrate relates to Defendant's failure to promote him to Class 2 engineer in July or August 2013.[16]  Therefore, Plaintiff must demonstrate a causal link between his complaint to Jacobs-El or the filing of his charge of discrimination and the failure to promote.  The construct of time, however, prevents Plaintiff from making this showing, as Plaintiff's adverse employment action occurred *before* he made either protected complaint.  Accordingly, Plaintiff has failed to demonstrate that he was retaliated against in violation of either the ADA or Title VII.  The Court thus grants summary judgment for Defendant on Count IV and Count V.

## IV. Conclusion

For the reasons stated above, the Court grants Defendant's motion for summary judgment [59].  The Court will enter final judgment and close the case.

Dated:  September 28, 2017

_____
Robert M. Dow, Jr.
United States District Judge

---

[16] The Court notes that the standard for retaliation claims is not as high as the standard for discrimination claims.  "In the retaliation context, the challenged adverse action need not be one that affects the terms and conditions of employment, but it 'must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'"  *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (quoting *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)).  Applying this lower standard, the Court still concludes that the pre-discipline notices are not by themselves adverse employment actions for his retaliation claims, for the reasons set out above, particularly that Plaintiff has not presented evidence that the notices had any consequences whatsoever on his employment.